FILED (M)
1993 NOV 16 PM 2:34
CLERK U.S. DIST. COURT
WESTERN DIST. OF MICH
BY pe

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

UNITED STATES OF AMERICA,

-v- File No. 2: 91-CR 13

JAMES CURTIS LEBLANC, JR.,

Defendant.

SENTENCING HEARING

BEFORE THE HONORABLE R. ALLAN EDGAR, U.S. DISTRICT JUDGE

Proceedings held in the above-entitled matter at the U.S. District Courthouse in the City of Marquette, Michigan 49855, on Wednesday, September 23, 1992, at 8:40 A.M.

APPEARANCES:

For the Government:
MR. JUDD R. SPRAY (P20859)
Assistant U.S. Attorney
Western District of Michigan
Northern Division
Federal Building
Marquette, MI 49855
(906) 226-2500

For the Defendant:
MR. PAUL A. PETERSON (P24755)
Steward, Peterson, Sheridan & Nancarrow
109 South Front Street
Marquette, MI 49855
(906) 228-5715

Reported by:
Caryl Hyry, RPR, CSR-2630
Certified Shorthand Reporter
(906) 486-6690

PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

-49-

TABLE OF CONTENTS


| | PAGE |
|---|---|
| **WITNESSES: GOVERNMENT** | |
| None | |
| **WITNESSES: DEFENDANT** | |
| JAMES CURTIS LEBLANC, JR. | |
| Direct Examination by Mr. Peterson | 5 |
| Cross-Examination by Mr. Spray | 8 |
| Redirect Examination by Mr. Peterson | 12 |

**EXHIBITS:**

| | | Marked | Admitted |
|---|---|---|---|
| Government One | F.B.I. Report | 4 | 4 |
| Government Two | F.B.I. Report | 12 | 4 |




PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

Marquette, Michigan 49855

Wednesday, September 23, 1992 - 8:40 A.M.

THE COURT: I call the case of the United States of America -v- James LeBlanc, File No. 2: 91-CR 13.

All right, the Court will recognize that the Defendant is here at present along with his Counsel, Mr. Peterson.

MR. PETERSON: Good morning, your Honor.

THE COURT: The Court at this time will accept the Plea Agreement, which has been entered into between this Defendant and the Government. The Court has reviewed the Pre-Sentence Report prepared by the Probation Office. Have you reviewed that report, Mr. Peterson?

MR. PETERSON: I have, your Honor.

THE COURT: And, Mr. LeBlanc, have you read that Report?

THE DEFENDANT: Yes, sir.

THE COURT: All right, I note that there are some comments and at least one matter in the Pre-Sentencing Report which have been objected to which might affect the Sentencing Guidelines. Do you wish to address yourself to any of those matters, Mr. Peterson, at this time?

MR. PETERSON: Your Honor, I did have an opportunity in filing my objection to the Report to indicate the objection Mr. LeBlanc had. The primary issue that



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

affects the Guidelines is whether or not at the time the offense occurred he was babysitting the young boy. He is quite adamant in his discussions with me and as we represented to the Court through the Probation Officer, that he wasn't in fact babysitting at the time. We know that does affect the Guidelines. We would ask for your consideration in that regard. Mr. LeBlanc is here prepared to testify if necessary to add to the statement we have already made through the Probation Officer.

THE COURT: All right, Mr. Spray, do you have proof on that issue you are ready to provide?

MR. SPRAY: Your Honor, the Government's proof on that issue this morning would be in reliance on the Report prepared by Special Agent Kleinpaste of his interview with the victim in this matter. We would allege that the first incident of Criminal Sexual Conduct occurred when he was being babysat by the Defendant, and it continued thereafter; it would be the Government's position that would be part of the relevant conduct of this offense. We would offer then the Report of the Agent Kleinpaste from the interview as our evidence.

THE COURT: All right, you can submit those Government Exhibits, Government Exhibit One, to the Sentencing Hearing.

(Government Exhibit Number One, F.B.I. Report,



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

marked by the Clerk and admitted into evidence.)

THE COURT: I take it we don't have Agent Kleinpaste here to testify?

MR. SPRAY: That's correct, your Honor. I would present him but he is out of the City of Marquette at this time. (Handing papers to Court)

THE COURT: Okay, all right, I will review that. Mr. Peterson, do you want to put the Defendant on the stand?

MR. PETERSON: I would call Mr. LeBlanc.

THE CLERK: Raise your right hand, please. Do you solemnly swear or affirm that the testimony you are about to give in the matter before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE DEFENDANT: Yes, ma'am.

THE CLERK: Take the stand, please.

THE COURT: Have a seat.

JAMES CURTIS LEBLANC, JR.

HAVING BEEN CALLED BY THE DEFENSE AT 8:41 A.M. AND SWORN BY THE CLERK, TESTIFIED:

DIRECT EXAMINATION

BY MR. PETERSON:

Q Jim, would you state for the record your name and your current address where you reside?



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

A James Curtis LeBlanc, Marquette County Jail.
Q As a result of your plea in this case, a Pre-Sentence Report was prepared and you had a chance to review that Pre-Sentence Report; is that correct, Jim?
A Yes, sir.
Q Within that Pre-Sentence Report there was a statement in Paragraph 9, and I will quote that:
"The first incident occurred one night when the Defendant was babysitting the victim and his two sisters at their home on the Reservation."
Do you remember reading that sentence?
A Yes, sir.
Q You disagree with that sentence?
A Yes, sir.
Q Could you explain to the Judge as best you can recall what the situation was when you first had contact with Eric?
A It was a -- you see, I was living with my parents at the time in my parents' home, and Eric, he, he lived about six houses away and in the housing project, and he used to just -- and he used to just wander around the housing project, and that's how he came over to my parents' house while I was there, and that's how I -- that's when it started, began.
Q It happened at your parents' house?
A Yes.



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

Q Were your parents home at the time?
A Yes, they were.
Q Do you recall having been asked by Eric's mother to babysit him that evening?
A No. She, she never asked me to babysit.
Q Did you ever recall babysitting Eric?
A Years, years ago, when I was young, a young person, so -- but not since I was fifteen.
Q All right, is there a particular reason why you weren't asked to babysit Eric?
A We were not a very close -- we weren't very close. We weren't friends. It wasn't something she would ask me.
Q Now, as I understand there were more than one occasion involving you and Eric?
A Yes, sir.
Q On any of those occasions were you babysitting Eric?
A No, sir. He would -- he would just come to my house, freely to my parents' house where I was living.
Q And on those occasions were your parents generally home?
A Some of the times, yes, yeah. I would say most, most of the time, yes.

MR. PETERSON: Okay, I have no further questions. Thank you, your Honor.

THE COURT: Do you need these statements for purposes of Cross-Examination, Mr. Spray?



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

MR. SPRAY: Yes, your Honor.

CROSS-EXAMINATION

BY MR. SPRAY:

Q Mr. LeBlanc, it's your testimony this morning that the first incident occurred at your parents' home?

A Yes, sir.

Q Where in your parents' home?

A My bedroom, I'd say.

Q And in your bedroom?

A Yes, sir.

Q Do you recall making a statement to Special Agent Kleinpaste in this matter early on in the investigation?

A Yes, I do.

Q Do you recall telling Special Agent Kleinpaste that the first incident that you recall occurred in a tent in your back yard?

A Yeah, it was my, my parents' back yard, my parents' house.

Q That's not your bedroom, is it?

A No, it's not, I guess, no. I've misspoken, sorry.

Q Did you make a mistake?

A Sir?

Q Did you make a mistake just now?

A I just -- I just -- I was thinking about my bedroom, sir.

Q Has this happened so often that you can't remember when and where it happened? That really is true, isn't it?



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

A No, sir. It's just something I -- I'm trying to think about very much --
Q You were prepared for your testimony this morning, were you not?
A I am not, no, sir.
Q You knew that the -- it was an issue as to when and where the first incident occurred, did you not?
A I didn't think I was going to have to --
Q But your testimony this morning was that it happened in your bedroom, and what you told Agent Kleinpaste, it happened in the tent; is that correct?
A Yes.
Q Where did it happen?
A May I say something, sir?
Q Do you remember where it, the first incident occurred?
A Like I said, sir, I was -- it was not something that would have been asked of me, I was not a -- towards the end of my time at home, I was a, what we call unreliable -- I was, I was alcoholic. I was troubled. I wouldn't be asked to do something like that. I was not a -- it was not a close family.
Q Is your ability to recall what happened in that period of time impaired, that, is, damaged by your consumption of alcohol?
A No, no, sir.



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

Q Do you recall a time when you babysat your nephew and his sisters?
A When I was perhaps fourteen or fifteen, that was about the -- that would have been about the last time, I think, yeah, except for an amount of time not too long before my arrest. I found a -- I went to a kid's house, I believe, and they were alone at night, so I took them to my parents' house, but that was -- but I didn't really watch them. I just took them to my parents' house.
Q Do you recall an incident that occurred between you and your nephew in the bathroom of your home?
A My parents' house?
Q Yes.
A Yes, sir.
Q And your nephew's sisters were there?
A No, sir.
Q Can you describe your parents' home?
A It's a one-story house, three bedrooms -- I don't know.
Q Can you describe your nephew's home?
A I, I don't -- I -- no, I couldn't.
Q Is it a red story -- two-story dwelling?
A I think it's a trailer.
Q You think his house is a trailer?
A The -- as far as I know, it is.
Q Did he ever live in a a red two-story dwelling, if you know?



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

A Yes, years ago, I believe.
Q In the Pine Village Housing Project?
A Yes, sir.
Q And he lived there with his sisters?
A Sir?
Q He lived there with his sisters?
A Three, three years ago, maybe.
Q Did you babysit them at that house?
A No.
Q You never did?
A No, but like I said, by that time I was -- I, I wouldn't -- I wouldn't have done -- I wouldn't babysit, I wouldn't do stuff like that, I was -- I wouldn't -- I, I just wouldn't, it just wouldn't have happened, I wouldn't be asked to do, to babysit.
Q You liked Eric; did you not?
A Well, once, years ago.
Q You didn't like him during the period of this abuse?
A It -- my feelings died.
Q Did he know that?
A I couldn't say. I don't know.
Q You took him places, didn't you?
A No, not really, no. Maybe to the store.
Q You didn't take him fishing?
A Well, maybe, maybe once or twice, not --



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

Q Did you take him for rides in your truck?
A Not very often, no.
Q Did you camp in your back yard with him?
A Not, not really. We set up a tent, but it started to rain so we, we went back and talked -- went to my parents' house instead.
Q When was that?
A I don't know, three years, two years ago, at my -- I'm not really good with time.

MR. SPRAY: I have no other questions of the Witness, your Honor. In addition to Government Exhibit Number One, I would also offer Government Exhibit Number Two.

(Government Exhibit Two, F.B.I. Report, marked by the Clerk; admitted into evidence from Page 4, Line 22.)

THE COURT: Any Redirect, Mr. Peterson?

MR. PETERSON: I would like an opportunity to look at the Exhibits, your Honor, and --

THE COURT: Yes, here (handing).

MR. PETERSON: -- definitely look them over.

REDIRECT EXAMINATION

BY MR. PETERSON:

Q Jim, regardless of whether the first incident occurred in your bedroom or out in the tent, were you babysitting that evening?



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

A No, I wasn't.
Q Okay, and to the best of your recollection you were never babysitting him?
A No, unh-unh (negative). Like I said, he just lived around the corner. Like I said, we didn't have, during that time period --
Q In response to one of the answers -- or one of the questions asked you by Mr. Spray, you said, "I couldn't have babysat." Was there something in your own mind or some reason you would not have done it if asked?
A I was, like I said, we weren't very close, family-wise. I don't -- it was -- there's a -- it was almost like there was a hatred, not a friendliness.
Q Okay.
A I mean.

MR. PETERSON: I have no further questions, your Honor.

THE COURT: Can I see those? (Indicating.) Anything further from this Witness?

MR. SPRAY: Not from the Government, your Honor.

THE COURT: Okay, you can step down.

(Witness excused at 8:55 A.M.)

THE COURT: All right, I will hear you on this. I guess it's you first, Mr. Peterson.

MR. PETERSON: Thank you, your Honor. I -- the



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

Court has heard the testimony of Mr. LeBlanc indicating that at the time these incidents occurred his nephew was, I guess, maybe broadly, I would say, loose on the Reservation. Apparently matters had deteriorated between his sister and he to the point that at least in his mind she would not have asked him to babysit her children, her son, and he would not have done it if asked. The Court, I know, has had access to the Psychological Evaluation and of the determinations of the Pre-Sentence Report. I think the Court in considering these matters can concede there certainly was an estranged relationship between Mr. LeBlanc and his half-sister. There had been through the course of Mr. LeBlanc's testimony, during the evaluation, that episode of prior sexual abuse by his half-sister, which would certainly substantiate the strain of the relationship between him and his, his half-sister. The indications are in, from Mr. LeBlanc's testimony, that his nephew came over, was visiting the family home that evening. Whether they went into his bedroom or out in the tent, I would submit to your Honor that there is no evidence of that type of supervision or custodial control equivalent to babysitting that would justify the additional two points in this situation. I think the evidence is clear that Jim was seeing his nephew; that as a result of seeing his nephew, these episodes began as a result of the prior sexual abuse,



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

but I do not believe that what we have here is a situation of Mr. LeBlanc taking advantage of a control situation such as babysitting that would justify the additional two points. For that reason, we would ask that the Sentencing Guidelines be modified to not include those two points. Simply here we have activity between an uncle and a nephew, not in the type of control situation that the Guidelines call for the additional points. Thank you, your Honor.

THE COURT: Okay, Mr. Spray?

MR. SPRAY: Your Honor, the Court has before it the statements of the victim in this matter made to Agent Kleinpaste at the time of the initial investigation, and it has to contrast those statements against the statements of the Defendant here this morning. The Defendant took the stand, said under oath affirmatively, "This is where the first incident occurred. I wasn't babysitting." When confronted with the previous statement, he said, "Well, I guess I made a mistake as to where it occurred." It's quite clear the Defendant is fully aware of the consequences of a favorable ruling on this matter and is equally capable, I would submit -- based on the other matters the Court has had to review relative to this Pre-Sentence -- of being a highly manipulative, and I would use the words, scheming and conniving individual who has tailored his testimony this morning to meet the needs of



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

reducing the guideline range. We submit that the statements of the victim are reasonable and accurate.

THE COURT: The victim's statements, precisely what he said about the -- in the victim's statements about babysitting, can you point that out to me? Is the statement 8/1/91, of 8/1/91 and others? There are several statements here. Do you want to -- can you point out to me which one precisely that we are talking about, here?

MR. SPRAY: Your Honor, looking at the statement of -- it says, "Date of Transcription, August 1, 1991." The second paragraph of that statement, referring to the statement of the victim, he explained that James LeBlanc had been babysitting one night at his home located on the Bay Mills Indian Reservation. He was in the bathroom prior to going to bed, etc.

THE COURT: That was the one that was -- as far as we know, then, the report only shows or the statement shows perhaps one time, maybe numerous times that this occurred, that it was during the babysitting occurrence, then?

MR. SPRAY: That's correct, your Honor. I would not -- I think it's part of the relevant conduct of this offense, your Honor. I am not suggesting that every incident that occurred occurred in the babysitting context.

THE COURT: Well, I do think that -- and it's all fine -- that babysitting certainly wouldn't be, be an, an



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

appropriate reason for adding two levels to the Guideline, to the Guidelines of the sentencing structure, because if indeed it was babysitting, there would be under Section 2A3.1(b)(3) -- it takes a while to find these things -- 2A3.1(b)(3) --

MR. PETERSON: Page 37, I believe, your Honor.

THE COURT: The victim would be in the custody, care, or supervisory control of the Defendant in a babysitting situation. Clearly, however, in this cite, in this particular situation here, we are faced with -- the Court is faced with having to decide whether or not by preponderance of the evidence this role adjustment, this role, the defense level of computation should be increased on the facts of this particular case. It's a close question, but of course the Government has to carry its burden, here, by a preponderance of the evidence, while all I have here is a written statement given to the FBI by the victim that in one instance out of many the Defendant was babysitting the victim. There is no question but, but that in most of the incidents here babysitting was not the setting for this conduct. They were just together going around fishing or engaging in other activities. In this situation I'm going to find that the Government has not carried its burden of proof to increase the defense level two times based just on facts here in this particular case under Section 2A3.1(b)(3) of the



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

Sentencing Guidelines, which means that according to my calculations, the defense level total, then, instead of being 31, is 29, which yields a Guideline range of 108 to 135 months.

MR. PETERSON: That would be my calculations also, your Honor.

THE COURT: All right, is there anything else about the Pre-Sentence Report that you wish to comment on, Mr. Peterson?

MR. PETERSON: Your Honor, we, we had mentioned in an objection to the Report the issue of Mr. LeBlanc warning his nephew not to say anything. I'm not sure how that's going to impact on the Court. Certainly Mr. LeBlanc is here to again testify that he did not want --

THE COURT: I don't think it impacts, it doesn't impact the Guidelines.

MR. PETERSON: It does not impact the Guidelines?

THE COURT: Anyway, I don't think any of the other matters as I read them, any of the other matters you have raised, have an impact on the Guidelines. Is that your reading?

MR. PETERSON: That's my understanding, your Honor. I would assert that none of the remaining objections we had do impact on my client.

THE COURT: I would just say at this point I think



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

there has been one correction made, but it's a minor one having to do with exactly how old the victim was at the time he made the complaint, but I would just say that other matters other than the ones we have discussed here do not impact the Court's Sentencing Decision in this case.

MR. PETERSON: Under that circumstance, your Honor, then I don't see any need to proceed with any additional objections we may have.

THE COURT: All right, okay, so I'll make a final determination, then, that the Sentencing Guidelines in this case are 108 to 135 months, and I find that the Pre-Sentence Report with the exception that is noted is, is accurate, and the other matters that have been raised by the Defendant do not impact the Court's Sentencing Decision in this case.

All right, Mr. Peterson, I will give you a final opportunity at this time to say anything that you want to say on behalf of your client?

MR. PETERSON: Thank you, your Honor. Is it satisfactory that I remain here, your Honor?

THE COURT: That's fine.

MR. PETERSON: Your Honor, I spent a fair amount of time last evening trying to sit down and compose my thoughts with regard to Jim. I don't mean to go into a long history of everything, but in the many years that I have been practicing, I've, as I told Jim this yesterday, I look at



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

him as one of my most unique clients, both because of who Jim is and because of the facts behind this case. I would regret to say that I feel so strongly for Jim that I almost have a personal affront to Mr. Spray's comments earlier this morning that Jim was manipulative. I recognize Mr. Spray certainly has an opinion, but I could not disagree more, and if there was a way that I could stand up and shout and do somersaults in this Courtroom to express to the Court my feeling about Jim and my objections to that phrase, "manipulative", I would. This again in my belief is probably the most unique case that I have ever been involved with. This is not a situation like any other criminal sexual conduct case that I have ever had. In previous cases, it's always been an individual either who did not do it or did it and had the pedophile profiles that this Court and every other Court in this country is so concerned about.

Here we have what I believe is purely a case of revenge, not a case that justifies an insanity defense as we all know because of the evaluations that were performed, but none -- the case, nonetheless a case where we see a Defendant reacting to something that happened to him years before, a reaction that he shouldn't have had, that he now has expressed to the Court. I believe very eloquently in his statement he should not have had and he should not have done, but nonetheless actions which he undertook



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

simply to get back at his sister. The Probation Officer has indicated that Jim's statements to the Court are not manipulative but are sincere and remorseful. I think Dr. Moore's report equally indicates no efforts, efforts by Jim to manipulate this Court, the Government, or the entire system, but in an individual who is suffering from actions that were performed on him by his sister many years previously. I know the Court -- I was very specific to Mr. Bennett asking that report be delivered to the Court because this, this report, the conclusions Dr. Moore arrived at, I think, tell better than I could ever what happened to Jim in years past to cause the acting out, the sexual abuse that he subsequently became involved with. It was interesting that in talking with Jim for several months before this evaluation, Jim was telling me these things about his sister. He was telling his thoughts. We had the evaluation performed. When I first went to see him with the results, he was looking like lights, lights were going on in his brain, suddenly realizing and suddenly being told by an expert why he was doing the things he was doing, that his reactions, while not acceptable, were not unusual in this type of situation. I was quite surprised myself when Dr. Moore diagnosed it -- or at least categorized it as Post-Traumatic Stress Disorder. The doctors in his evaluation indicate that there is abundant indication of



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

almost a decade, long existence of significant Post-Traumatic Stress Disorder.

Again, I don't, I don't feel the need certainly to go through this report piece by piece, but Dr. Moore did not indicate that Jim was manipulating anybody. In fact, he indicates in his report on Page 3 that what Jim was encountering was a very common collection of after-effects of traumatic stress. The doctor pointed to what, a head injury Jim had sustained, an episode between Jim and his sister that seemed to trigger this whole activity, and I think the conclusions that Dr. Moore came up with were particularly important to Jim because they give Jim hope for the future. The doctor now has told Jim why he did what he did. His doctor is also telling him that at the time he did that -- to use the doctor's terms -- he was in a helpless and hopeless mental state. Not insane, we recognize that, that's why Jim has pled as he has, that's why Jim is here today; but certainly he was not of the controlled acting out that this Court and other Courts would normally see in a criminal sexual conduct case. The doctor's conclusion that it was only by accident that he and his nephew were in the same place at the same time that this developed is maybe indicative of Jim's unique situation and the uniqueness of this case.

I'm not saying -- I don't think Jim would, would



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

testify to this Court that that right time, wrong place was not going to come eventually. His hatred for his sister is certainly well spelled out in this evaluation. It's well spelled out in his statement to the Court. I think something was eventually going to happen. Unfortunately, it was triggered by Jim's running into his sister and subsequently meeting up with her son.

Yesterday when I was reviewing this with Jim, I told him, I said, "Jim, I quite certainly believe that your acting out with, with Eric is not much different" -- again this is my own personal feeling -- "than if he had gone and wrecked her car" as a way to get back at Denise. I said, "The equivalent to shooting her dog," and his response was he had in fact shot her dog shortly before this happened. I don't mean to, to trivialize what happened to Eric at all, but I think it's indicative, as Dr. Moore has pointed out, of the reaction that Jim was suffering from and what was going on his mind when he undertook to abuse Eric. Jim was driven to do this. I think Dr. Moore has indicated that he thinks it was going to happen, it was going to happen not because Jim wanted it to happen, but because he was reacting to the situation.

Jim has provided, again, as I pointed out to the Court, an eloquent statement. He is not denying his guilt. He is not denying the need to be punished. He indicates to



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

the Court at one point, "I thought it would be fitting if I messed with her child, I felt that justice would be done and she would finally get her's." He goes on, "I even made sure that I used the same words to seduce her child as she used while seducing me."

I recognize that there are varieties of reasons that a Court sentences punishment, you know, restitution, rehabilitation, protection of society, and I know and I think Jim recognizes that there is punishment that's going to be involved with this matter, and there should be. However, I believe that this again is not the situation where the Court must be concerned for protecting society in the future. I think the report from Dr. Moore is quite clear. Jim's statement to the Court is quite clear, that he was -- he was entirely focused on revenge for his sister. That revenge unfortunately has now been satiated. I don't believe that Jim is a threat to go out and abuse other young children. I do not see it. I don't think the indication from Dr. Moore's report is that that would happen. I think Jim is certainly someone capable of rehabilitation. I think that can be seen from the statement he provided to this Court.

In talking with Jim yesterday, he is looking forward. He is not looking back. His comments to me included, "I have a different frame of mind. I hate what I



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

did. I don't hate the police. I don't hate others. I hate what I did. I hate what I became. Now I don't want to blame others. I just want to cure my problems. I am going to prison, but Denise is in her own prison; but I will come out."

Jim has told me that his family is very supportive, that Dr. Moore's report has been circulated among aunts and uncles that were continually asking his father and mother, "Why did Jim change, why this boy that was an honor roll student in Detroit became a fifteen-year-old dropout, a drug addict, an alcoholic." Everybody seems now to say, "Yes, why didn't we see it?" Jim has indicated to me that he doesn't want to hurt again. He is very emotional about this whole episode. Again, I, I have complete faith in Jim. I trust him. I trust the things he is saying probably more than I have any client in my legal history, I believe, and I would ask the Court to consider the fact that Jim is progressing. He has had treatment, at least some counseling when he was in Escanaba when he was jailed there. He is looking forward to counseling. We would certainly urge the Court that during the time he is in prison he receives counseling. I think it would be extremely beneficial to him.

I primarily want at this time, your Honor -- and I recognize that, the very big benefit the Court has already



PENGAD/INDY. MUNCIE. IN 47302 SF-SMI-25

given Jim in agreeing to drop the two points -- but I, I still believe that this is a unique case that's not necessarily governed by all of the terms of the Guidelines. Mr. Bennett had indicated that he didn't believe there was any reason for departure. I believe this Court should incur a departure lower. If you look at the Guidelines, your Honor, there is no -- there is no place to put this case. This case is put in with any normal pedophile who has an emotional problem and is out abusing children. This is not that case. Jim was not acting out because of pedophile tendencies but as a way to get back at his sister. This is not addressed in the Guidelines. I think Jim is not as serious a criminal that needs extreme punishment by this Court as an individual in his situation. As the Court has indicated, the Guidelines now, the range is nine to eleven-and-one-quarter years. I would submit to the Court that his sentence of five years in Jim's case would be certainly appropriate. I recognize that is a departure, and in many cases an extended departure, but again I look at Jim as a very unique individual who has committed a unique crime; a crime nonetheless for which he should be punished, but I, I can submit to the Court without hesitation I do not see Jim committing any crime like this or probably any crime of any nature again. For that reason, I believe that this term of incarceration with the counseling



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

that he would receive during that period of time would be sufficient to certainly allow him to become a very productive member of society when he is released. Thank you very much for the Court's time.

THE COURT: Mr. LeBlanc, you have an opportunity at this time if you wish to say anything to the Court you wish to say?

THE DEFENDANT: Yes, sir. All I can say is I, I look back on things I have done and I, I, like I said, I hate what I let myself become, you know. It hurts me because I have been going to treatment and seeing counselors and stuff, and I see so many other people, you know. They have been through things in many situations worse, you know, and they overcome, that they have gone and got help and they've, you know, they've gone on for life, and, and I hate, I hate what I let myself become. I just -- I only always assumed I quit caring. I just let myself become less than almost human. I -- back then I was, I had a level -- it was just myself, a role of hate. I quit, I let -- I quit caring about how other people felt or fear. Greg Morris -- I kept looking at my own problems and kept looking at my own feelings, and in doing so I selfishly hurt everyone around me. My poor parents over there, I hurt them so many times while growing up, and my friends, any person I -- whoever tried to be a friend to me, I hurt. I just



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

let -- I was so selfish, and then I finally, to top it off, I had to hurt a child. Like I say, I, I'm -- I'm going to be going to prison. I can accept that, and what can I say? I can't even -- I can't even be upset about it. I can't even be mad at it. I just, I just hate, I hate what I have done, sir. I don't know who to apologize to; and I apologize to the country, to the Court, to my victims, to my family. Everyone I ever hurt, you know, I'm just -- I, I swear, your Honor, I will never forget what I have done and I will never forgive myself for that, no matter what happens, I will never forgive myself for it; and I swear I will die before I ever hurt someone again. I will never, never hurt no one again, your Honor. I'm just very sorry, your Honor, sorry for everyone I hurt, I'm sorry for them as well. I'm sorry, sir.

THE COURT: Okay, Mr. Spray, does the Government have anything to say in this case?

MR. SPRAY: Your Honor, I agree with Mr. Peterson, that this is an unusual and unique case. Certainly it is in my experience dealing with sexual abusers. The Defendant has told you, he has told others, that this was not the product of some need that he had to abuse a child. This is something that very few of us truly understand. This was a conscious, cold-blooded, calculated act to hurt one person and thereby hurt another; that he thought about it, he



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

schemed to do it, he executed the plan to do it. It's shocking to me to have it characterized as being on a plane with injuring her car or perhaps shooting her dog -- which, incidentally, the Defendant also admits he did. This was a child, a human being, and he used that child, abused that child without any regard for its impact on that child. Now he says he did that as a means of revenge on someone else. Had he pointed a gun at that child and shot it or shot someone else, I wonder if Mr. Peterson would say, "Well, you could have damaged her car or shot her dog, I guess you chose to shoot her." It's -- this is a cold-blooded, calculated crime, and far from suggesting a downward departure because somehow the Defendant has now found a means to, to express himself, this Defendant is before the Court not as a first-time offender. He has committed burglary. He has committed armed assault, and now he has committed this assault and these assaults on this child. This case does not call for a downward departure by any stretch of the imagination, your Honor. I would -- we would ask the Court to impose a sentence at the upward edges, end of the range, for the guideline range, reflecting this Defendant's cold-blooded, calculating commission of this offense.

The Government has no more to say, your Honor.

THE COURT: Okay, this is a disturbing and sad case, to say the least. I certainly hope that Mr. Peterson



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

is right and that there is no risk of this happening again. I certainly hope the Defendant is right, that there is no risk of this happening again, I certainly hope, and that the Defendant will be able to get himself straightened out in the future. He will need some help to do this, and of course only time will tell.

The Court is required to give reasons for a Sentence which it imposes on the Guidelines. The Sentence in this case is necessary to reflect the seriousness of this offense. It's necessary also to protect the public, not to mention members of the Defendant's own family, family group, from the kind of conduct that he has engaged in in the past.

The Court Sentence will be in the middle of the Sentencing Guidelines as collated by the Court a moment ago, for the reasons that the Court can see no particular mitigating or aggravating factor which would dictate otherwise. There is no reason for departure in this case that is permissible under the Sentencing Guidelines. It can't be said that this is the case, that this is the kind of case which was not anticipated by the Guidelines. I, I believe it was. Having said that, pursuant to the Sentencing Guidelines before me of 1984, it's the judgment of this Court that the Defendant James Curtis LeBlanc is hereby placed in the custody of the Bureau of Prisons for



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

a term of 125 months. Upon a release from the imprisonment, the Defendant shall be placed on supervised release for a term of five years. Within 72 hours of release from the custody of the Bureau of Prisons, Defendant shall report in person to the Probation Office in the district to which he is released. While on supervised release, the Defendant shall not commit another federal, state, or local crime; shall comply with the standard conditions of supervised release, and shall comply with the following additional conditions: One, the Defendant shall not own or possess a firearm or other dangerous weapon. Two, Defendant shall participate in substance abuse counseling, to include random urine screening to determine if he has reverted to drug or alcohol use, as directed by the Probation Officer. Three, Defendant shall participate in mental health counseling as directed by the Probation Officer. It's further ordered the Defendant pay a special Court Assessment Fee of $50, as required by the Comprehensive Crime Control Act.

The Court declines to impose a fine in this case because under Section 5E1.2(f) of the Sentencing Guidelines the Defendant doesn't seem like he would be able to come within the range -- the guidelines of the range found.

The Court will recommend to the Bureau of Prisons that the Defendant receive substance abuse treatment and mental health counseling while he is in the custody of the



PENGAD/INDY. MUNCIE, IN 47302 SF-SMI-25

Attorney General.

All right, is there -- are there any questions about the Court's sentence?

MR. PETERSON: The Defense has none, your Honor.

MR. SPRAY: None of the Government, your Honor.

THE COURT: Okay, I think that I should state at this time that you have a right to appeal your sentence, Mr. LeBlanc. If you wish to appeal your sentence -- not your conviction, but your sentence -- you can consult with your attorney and file a notice, and appeal within ten days in the Clerk's Office under the Federal Rules of Appellate Procedure, Rule Four.

All right, I think this, this matter is now concluded. We will be in recess for about fifteen, twenty minutes or so.

**************

(Hearing concluded at 9:30 A.M.)



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302

STATE OF MICHIGAN )
)ss.
COUNTY OF MARQUETTE)

I certify that this transcript, consisting of 32 pages, to the best of my ability is a complete, true, and correct transcript of the proceedings and testimony taken in this case on Wednesday, September 23, 1992, before The Honorable R. Allan Edgar, U.S. District Judge.

November 13, 1993

Caryl Hyry, RPR, CSR-2630
Certified Shorthand Reporter
1025 North Shore Drive
Ishpeming, Michigan 4849
(906) 486-6690

R. CARYL HYRY
NOTARY PUBLIC STATE OF MICHIGAN
MARQUETTE COUNTY
MY COMMISSION EXP. FEB. 12, 1994



SF-SMI-25 PENGAD/INDY. MUNCIE, IN 47302